John N. GOUDIE, Petitioner,

v.

UNITED STATES of America,
Respondent.

Nos. 03–21071–CIV–
LENARD/BANDSTRA.

United States District Court,
S.D. Florida.

June 21, 2004.

Reemberto Diaz, Miami, FL, Counsel for Petitioner.

Thomas Mulvihill, Assistant United States Attorney, United States Attorney's Office, Miami, FL, Counsel for Respondents.

### ORDER DECLINING TO ADOPT REPORT OF MAGISTRATE JUDGE AND DENYING PETITIONER'S MOTION TO VACATE PURSUANT TO 28 U.S.C. § 2255

LENARD, District Judge.

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate Judge Ted E. Bandstra (D.E.11), issued on August 7, 2003, recommending that the Court grant the Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, filed by Petitioner John N. Goudie on April 29, 2003. The Government filed Objections on August 22, 2003. (D.E.12.) Petitioner filed his Response to the Government's Objections on September 3, 2003. (D.E.13.) On January 14th and January 16th, 2004, the Court held an evidentiary hearing on the Motion. On February 5, 2004, Petitioner filed his Post–Hearing Memorandum. (D.E.22.) On February 6, 2004, the Government filed its memorandum. (D.E.23.) Having conducted a *de novo* review of the Report, the Objections, and the record, the Court finds as follows.

### I. Procedural Background

On July 28, 1997, Petitioner John Goudie was indicted on four counts of conspiracy and money laundering in violation of 18 U.S.C. §§ 371, 1956(h), 1956(a)(1)(A), and 1956(a)(1)(B). (97–582–CR–LENARD (hereinafter "CR"), D.E. 3.) On December 14, 1998, after a ten-week jury trial, Petitioner was convicted on all four counts. (CR, D.E.503.) On May 14, 1998, the Court sentenced Petitioner to a term of 60 months imprisonment, followed by a three-year term of supervised release. (CR, D.E.699.) Petitioner appealed, and on July 17, 2002, the Eleventh Circuit affirmed his conviction and sentence. (CR, D.E.955.)

On April 29, 2003, Petitioner filed the instant Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, claiming ineffective assistance of counsel. (D.E.1.) Specifically, Petitioner alleged that his trial counsel failed to communicate a plea offer made to him by the Government prior to trial and that if Petitioner had been told about the plea offer, he would have accepted it. On July 21, 2003, the Magistrate Judge held an evidentiary hearing to determine the validity of Petitioner's claim of ineffective assistance. (D.E.10.) At the hearing, Petitioner John Goudie testified along with his trial counsel, Edward O'Donnell, former United States Attorney Alexander Angueira, co-defendant Julio Marrero, and his brother, Joseph Goudie.

On August 7, 2003, the Magistrate Judge issued his Report and Recommendation in this case. (D.E.11.) On August 22, 2003, the Government filed Objections to the Report (D.E.12) and on September 3, 2003, Petitioner filed his Response to the Government's Objections (D.E.13). On January 14th and January 16th, 2004, the Court held a *de novo* evidentiary hearing on the Motion, the Report, and the Objections. (D.E.19–20.) At that hearing, witnesses who had testified at the July 21, 2004 hearing, including Petitioner, Edward O'Donnell, Alexander Angueira, and Joseph Goudie, testified again. In addition, Jim McMaster, the attorney who represented co-defendant Jose Macia, and Howard Srebnick, the attorney who represented co-defendant Alejandro De Leon, both testified for the first time. Julio Marrero did not testify, but both sides agreed to incorporate the transcript of his testimony at the July 21, 2003 hearing into the record. (1/16/04 Tr. at 13.) At the conclusion

of testimony, the Court instructed the parties to present their closing arguments in memorandum form within twenty-one days. *Id.* at 15–16. On February 5, 2004, Petitioner filed his Post–Hearing Memorandum. (D.E.22.) On February 6, 2004, the Government filed its memorandum. (D.E.23.)

## II.  Factual Background

During the Evidentiary Hearings held on January 14th and 16th, 2004, both former United States Attorney Alexander Angueira and Petitioner's attorney, Edward O'Donnell, testified that they recall discussing the possibility of a plea agreement at the offices of the United States Attorney approximately two weeks prior to the start of trial. (1/14/04 Tr. at 16–18, 30.) Angueira stated that he didn't recall the parameters of the plea that was offered, but knows that it was "a favorable plea." *Id.* at 32. O'Donnell testified that the Government was prepared to allow Petitioner to plead guilty to a misdemeanor and that Petitioner would not be required to serve any time nor would Petitioner be required to testify at trial. *Id.* at 19. O'Donnell testified that he discussed the plea offer with Petitioner the same day or "shortly thereafter." *Id.* at 13, 18. He stated that he told Petitioner about the plea offer in person during a private conversation in either the Tower Building[1] or the James Lawrence King Building of the Federal District Court in Miami. *Id.* at 13. O'Donnell explained that he repeated the plea offer, as it had been described to him: "Believe it or not there is a misdemeanor in Title 18. They are willing to let you plead guilty to a misdemeanor. You will not serve any time John nor will you be required to testify. No time, no testimony." *Id.* at 19. O'Donnell recounted that Petitioner immediately stated: "Ed, why should I plead guilty to anything, I

didn't do anything." *Id.* Then, O'Donnell recalled telling Petitioner that he admired his resolve. *Id.*

O'Donnell testified that after his conversation with Petitioner, he let the Government know that Petitioner had decided to go to trial. *Id.* at 23. Angueira recalls that O'Donnell approached him and Assistant United States Attorney Thomas Mulvihill as they were getting off the elevators in the Tower Courthouse and that O'Donnell told them that Petitioner was not going to take the plea and wanted to go to trial. *Id.* at 31. O'Donnell testified that he and Petitioner did not discuss the possibility of a plea offer again. *Id.* at 23.

Petitioner contends that O'Donnell never discussed the possibility of pleading guilty with him and never told him that the Government had offered to allow him to plead guilty to a misdemeanor prior to trial. *Id.* at 50–51. Petitioner testified that he only learned of the misdemeanor plea offer after the trial. *Id.* at 51. Petitioner's brother, Joseph Goudie, testified that he was not aware that Petitioner had ever been offered a plea prior to the jury's verdict. *Id.* at 59. Petitioner testified that he first learned about the misdemeanor plea on the day that the jury rendered its verdict. *Id.* at 51. He stated that he had "a meeting with the prosecution" during which "Mr. Mulvihill asked [him] why didn't [he] accept their offer." *Id.* at 52. Petitioner testified that his response was "what offer?" *Id.* Angueira's recollection of the exchange is very similar. *Id.* at 36–37. He testified that during a recess after the verdict was returned, Petitioner approached Mulvihill and him and asked if there was something that they could do for him. *Id.* at 36. Angueira stated that either he or Mulvihill said something like: "what do you mean, you should have taken the plea." *Id.* Angueira then recalls Petitioner asking them "what plea?" *Id.*

1.  The Federal Courthouse located at 301 N.   Miami Avenue, Miami, Florida, 33128.

Petitioner further testified that when he was found guilty he asked O'Donnell what kind of sentence he was facing "because [he] had never really talked to anybody [about] what [he]was facing." and that O'Donnell told him that he would call him during the next two weeks and explain the sentencing guidelines to him. *Id.* at 52, 57. Petitioner claims that O'Donnell never called him. *Id.* at 57. He states that his wife asked a friend's husband, an appellate attorney, to come over to the house and explain the Federal Sentencing Guidelines and his possible sentence under the Guidelines to him. *Id.* at 53. He claims that the attorney came and told.him that "[he] was looking at ten years of jail." *Id.* Petitioner also states that prior to his conversation with this attorney, he had not been aware of "the ramifications of the case." *Id.* However, Petitioner admitted on cross examination that prior to trial he knew that if he were convicted it would be a "very serious matter," and that he would be going to prison for a long time. *Id.*

Petitioner contends that if the misdemeanor plea offer had been communicated to him by his attorney at the time that it was made, approximately two weeks before the trial started, he would have accepted that offer. *Id.* at 54. He reasons that his "whole thing was not going to jail," and that he definitely would have accepted an offer that meant he wouldn't have had to go to jail or sit through a trial. *Id.* at 54.

O'Donnell testified that prior to trial Petitioner maintained that he was innocent of the charges against him. *Id.* at 7. O'Donnell further stated that he had discussed with Petitioner the defense he was going to engage in at trial. *Id.* O'Donnell stated that in defending Petitioner he intended to rely on the Government's lack of evidence. *Id.* at 8, 22. Moreover, O'Donnell testified that both he and Petitioner

believed that Jose Macia, Petitioner's "good friend" and co-defendant, would testify at the trial and that Macia's testimony would exonerate Petitioner. *Id.* at 8–9. Macia's attorney, James McMaster, also stated that Macia had intended to testify right up until the end of the trial and that he believed that Macia's testimony would have been favorable to Petitioner. *Id.* at 39–40. O'Donnell stated that during and since trial Petitioner has maintained that he. didn't do anything wrong and is innocent. *Id.* at 7, 14. Both O'Donnell and Angueira recalled and the record reflects that during his sentencing hearing, on May 11, 1999, Petitioner was asked if there was "any ·legal cause why the sentence of the law should not be pronounced upon [him]" and he replied, "I am not guilty." *Id.* at 14–15, 32; (*see also* Goudie Sentencing, 5/11/99 Tr. at 2–3).

O'Donnell testified that in the course of his representation of Petitioner, he had informed Petitioner that a guilty verdict would result in Petitioner being a convicted felon and that Petitioner could be sentenced to prison time. *Id.* at 15, 21. However, O'Donnell stated that he never discussed. with Petitioner, before or after the plea offer, the specific amount of prison time Petitioner was facing under the Sentencing Guidelines. *Id.* at 20–21. O'Donnell stated that he did not discuss the pleas of any of the other defendants in the case with Petitioner. *Id.* at 23–24. However, he testified that he and his client were present when Humberto Hernandez plead guilty to Count I of the Indictment, but did not recall whether either he or his client were present when Julio Marrero plead guilty to a misdemeanor on September 10, 1998. *Id.* at 10–11, 15–16, 23–24. Marrero testified that he did not see Petitioner in the courtroom when he pled guilty in this case and did not discuss his plea with Petitioner at`any time. (7/21/03 Tr. at 48.)[2] Petitioner does remember

---

**2.** Both parties stipulated to the incorporation    of Marrero's 7/21/03 testimony into the record

seeing Humberto Hernandez plead guilty to Count I of the Indictment[3] and hearing the Court instruct Hernandez on the statutory maximum for that offense and the implications of the Federal Sentencing Guidelines. *Id.* at 55–56; (*see also* Hernandez Change of Plea, 8/27/04 Tr. at 11–15). However, Petitioner stated that at the time he did not really understand what was going on or what Hernandez had pled to. *Id.* at 56.

McMaster testified that he learned that the Government made a misdemeanor plea offer to Petitioner and that Petitioner rejected the offer. *Id.* at 43. He does not recall who told him about the plea offer, but remembers that it was a topic of general conversation among the defense attorneys when they met after court proceedings and during breaks. *Id.* at 42–44. Specifically, McMaster recalls discussing Petitioner's rejection of the plea offer with his client, his wife, the other defense attorneys and some of the other clients "in and out." *Id.* at 44–45. He does not recall whether Petitioner participated in these discussions. *Id.* at 44–45. However, he stated that Petitioner's plea offer and his rejection of it was "a major focus of conversation for a period of time" and that "most of the lawyers couldn't believe Mr. Goudie would pass up the opportunity for a misdemeanor plea, whether he had done anything to justify a misdemeanor plea or not." *Id.* at 44–45. Co-defendant Alejandro De Leon's attorney, Howard Srebnick, also testified that at some point he learned that Petitioner had been offered a plea that would have allowed him to avoid jail time. (1/16/04 Tr. at 7.) However, Srebnick does not remember when or from

whom he learned this information. *Id.* Furthermore, Srebnick does not remember any specific meetings before trial with the attorneys remaining in the case, the purpose of which was to discuss plea offers that had been extended to clients or plea offers that had been taken by other defendants. *Id.* at 7–8.

### III. The Magistrate Judge's Report and Recommendation

In his Report, the Magistrate Judge found that "O'Donnell's performance was unreasonable under prevailing professional norms because of his failure to adequately advise petitioner about the specific terms of the plea offer and the potential consequences of going to trial." (Report at 6.) The Magistrate Judge did not resolve the issue of whether O'Donnell communicated the plea offer to Petitioner. Instead, he found that even if O'Donnell's recollection of events were accurate, O'Donnell's brief explanation of the "no time, no testimony" plea offer was insufficient to allow Petitioner to make an informed decision. *Id.* at 9. The Magistrate Judge found that O'Donnell's failure to discuss the advantages and disadvantages of the offer with Petitioner, to review the Sentencing Guidelines with Petitioner, or to explain to Petitioner the advisability of accepting or rejecting the offer, amounted to constitutionally ineffective assistance of counsel. *Id.* at 9–10.

The Magistrate Judge further found that Petitioner had successfully demonstrated that O'Donnell's "unreasonable acts or omissions prejudiced him." *Id.* at 10. Specifically, the Magistrate Judge de-

---

of the hearing before this Court on January 16, 2004. (1/16/03 Tr. at 13.)

**3.** On cross-examination of Petitioner, U.S. Attorney Mulvihill asked Petitioner if he was there when Hernandez was "sentenced." Petitioner answered "Yes." However, the next

question and answer suggest that both Mulvihill and Petitioner are actually referring to Hernandez' plea and not his sentencing. Moreover, the transcript of Humberto Hernandez' Change of Plea on August 27, 1998, indicates that Petitioner was present. (8/27/98 Tr. at 2.)

termined that a reasonable probability existed that but for O'Donnell's errors, Petitioner would have accepted the plea offer and pled guilty to a misdemeanor. *Id.* In reaching this conclusion, the Magistrate Judge relied on Petitioner's testimony, which he found to be "highly credible." *Id.* at 12 n. 8. In addition, the Magistrate Judge found that O'Donnell's testimony that the offer was "generous" and that he thought that Petitioner was going to be "delighted" with the offer corroborated Petitioner's testimony. *Id.* at 12 (quoting 7/21/03 Tr. at 13–14). Based on these findings, the Magistrate Judge recommended that the Court grant Petitioner's Motion to Vacate, Set Aside, or Correct Sentence. *Id.* at 13.

### IV. The Parties' Arguments

In its Objections to the Magistrate Judge's Report, the Government argues that O'Donnell's representation of Petitioner satisfied the effective assistance of counsel standard as contemplated by the Sixth Amendment of the United States Constitution. (Gov't. Obj. at 2.) The Government takes the position that in order to fall below the constitutional standard for communicating a plea offer to a client, an attorney must either fail to advise the client of the existence of the offer, or materially misrepresent its terms. *Id.* at 4. The Government argues that according to O'Donnell's account of events he did neither and that the Magistrate Judge's conclusion that O'Donnell provided ineffective assistance of counsel is incorrect as a matter of law. *Id.* at 6. The Government asserts that in order to find that O'Donnell's conduct amounted to ineffective assistance, the Magistrate Judge created a new constitutional right—the right to be advised in detail as to the significance of a plea offer and to receive a recommendation from counsel about whether or not to accept the offer. *Id.*

The Government contends that O'Donnell related the specifics of the plea offer to Petitioner, as constitutionally required, and that Petitioner was aware of the potential consequences of his refusal to accept. *Id.* The Government asserts that Petitioner knew that he was facing prison time if convicted. *Id.* Petitioner had been present in the courtroom when Humberto Hernandez pled guilty to Count I of the Indictment and heard the Court fully explain the potential penalties, including the applicability of the Sentencing Guidelines to that Count. *Id.* at 6–7. Moreover, the Government argues that an explanation of the Sentencing Guidelines was unnecessary in this case, as the plea offer specified that no jail time would be imposed. *Id.* at 7.

As for the prejudice prong, the Government asserts that Petitioner has failed to offer any evidence, other than his own post-sentencing testimony, that Petitioner would have accepted the Government's plea offer had it been sufficiently explained to him. *Id.* at 9. In fact, the Government argues that all of the uncontradicted evidence points to the opposite conclusion. *Id.* at 9–10. The Government's case against Petitioner was not strong and Petitioner professed his innocence throughout trial and sentencing. *Id.* Based on these facts, the Government contends that Petitioner's decision to reject the plea offer and to go to trial was simply an ill-advised strategic decision. *Id.* Thus, the Government argues that Petitioner has failed to establish that it is reasonably probable that Petitioner would have accepted the plea offer if it had been more thoroughly explained to him by O'Donnell. *Id.*

In its Post–Hearing Memorandum, the Government reiterates many of the arguments it made in support of its Objections. In addition, the Government asserts that the testimony of James McMaster, Jose

Macia's attorney, supports O'Donnell's account of events. (Gov't Post–Hearing Memo. at 6–7.) The Government points out that: (1) McMaster testified that he was aware of the plea offer extended to Petitioner by the Government and that the offer was a matter of general discussion in meetings between defense attorneys; and (2) McMaster also stated that Julio Marrero's plea to a misdemeanor was the subject of a joint defense strategy meeting. *Id.* at 6, 9. Furthermore, the Government asserts that the fact that Petitioner retained and continued to pay O'Donnell for months after the verdict, belies Petitioner's claim that O'Donnell failed to disclose the plea offer. *Id.* at 10.

In his Response to the Government's Objections, Petitioner asserts that the Magistrate Judge reached the proper conclusion in his Report and Recommendation. (Response at 1–2.) Petitioner also argues that the Government's Objections to the Report were untimely.[4] *Id.*

In his Post–Hearing Memorandum, Petitioner once again argues in favor of the reasoning and conclusions reached by the Magistrate Judge. Petitioner takes the position that criminal defense attorneys have a duty not only to inform their clients of all plea offers made by the prosecution, but also to "be involved in the decision-making process regarding the agreement's ultimate acceptance or rejection" and to explain to their clients the possible consequences of their decision. (Petitioner's Post–Hearing Memo. at 2–3.) Petitioner defines counsel's duty under *Strickland* as the responsibility "to ensure that the client has all the important facts and law to

consider, and for counsel to actually advise the client of a prudent course of action." *Id.* at 3. Petitioner further asserts that in order to fulfill this duty, a defense attorney must explain the maximum sentencing exposure the client would be facing should he or she choose to go to trial. *Id.* at 4–5.

Petitioner argues that O'Donnell never told him about the misdemeanor plea offer extended by the Government approximately two-weeks before this case went to trial. *Id.* at 10. Moreover, even if O'Donnell's account of events were to be believed, Petitioner contends that because O'Donnell did not get the plea offer in writing, did not attempt to calculate Petitioner's possible exposure under the Sentencing Guidelines, did not "explain the benefits of a 'plea of convenience,'" and did not "hammer into [Petitioner] the critical significance of the plea offer," O'Donnell's conduct fell below the constitutional standard for effective assistance of counsel. *Id.* at 7–8. Petitioner also contends that if he had been properly informed of the plea offer, he would have accepted that offer. *Id.* at 10. Petitioner argues that his statements that he was innocent of the charges both during trial and at sentencing are not evidence that he would not have taken the plea offer. *Id.* at 12. Instead, he takes the position that it is common for innocent people to enter into plea agreements in order to avoid jail time. *Id.* In addition, Petitioner argues that his continued retention and payment of O'Donnell for several months after allegedly learning about the plea offer demonstrates only that he is an honest person who honors his debts. *Id.* at 13. In conclusion, Petitioner argues that

---

**4.** Having reviewed Government's Exhibit 2, introduced at the evidentiary hearing held on January 16, 2004, the Court finds that the Government's Objections were timely. Government's Exhibit 2 is a copy of the fax cover sheet attached to the Magistrate Judge's Report and Recommendation, dated August 8, 2004. Pursuant to 28 U.S.C. § 636(b)(1)(C), the Government had 10 days from receipt of the Report within which to file objections. Computing the 10 days pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, the Government had until August 22, 2004, to file its objections. The Court's docket indicates that the Government night-box filed its Objections on August 22, 2004.

"it defies logic for one to assume that [Petitioner] would not have taken such an incredibly generous offer" and the more likely scenario is that O'Donnell was convinced that Petitioner would not want to plead and "cavalierly rejected" the offer without consulting his client. *Id.*

## V. Analysis

### A. Ineffective Assistance of Counsel

■ To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that (1) "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden of proof remains on the petitioner throughout a habeas corpus proceeding. *Roberts v. Wainwright,* 666 F.2d 517, 519 n. 3 (11th Cir.1982.) A court may decline to reach the performance prong of the *Strickland* test if it finds that the prejudice prong cannot be satisfied. *Id.* at 697, 104 S.Ct. 2052; *Waters v. Thomas,* 46 F.3d 1506, 1510 (11th Cir.1995). To satisfy the prejudice prong, Petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The *Strickland* Court recognized that the standard must be "highly deferential," and that a court reviewing an ineffective assistance of counsel claim, must "indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052. The Supreme Court has applied the two-part *Strickland* analysis to challenges of guilty pleas based on ineffective assistance of counsel, *Hill v. Lockhart,* 474 U.S. 52, 56–57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), and the Eleventh Circuit has extended it to ineffective assistance claims made by defendants who rejected guilty pleas, *Coulter v. Herring,* 60 F.3d 1499, 1504 n. 7 (11th Cir.1995).

### i. Objective Performance Prong

■ In order to satisfy the performance prong of the *Strickland* analysis, Petitioner must demonstrate that O'Donnell "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687, 104 S.Ct. 2052. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. According to the *Strickland* opinion, one of the basic duties of a criminal defense counsel is "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* It is clear that where the prosecution has proffered a plea agreement, a defense attorney must inform his client about the proposed plea agreement, and that failure to do so constitutes ineffective assistance of counsel. *Diaz v. United States,* 930 F.2d at 834; *Johnson v. Duckworth,* 793 F.2d 898, 902 (7th Cir.1986). However, the Court does not find that O'Donnell failed to inform Petitioner about the plea offer in this case.

At the hearing before Magistrate Judge Bandstra, Petitioner testified that O'Donnell never told him about the misdemeanor plea offer extended by the Government prior to trial. (1/14/04 Tr. at 50–51.) However, the Magistrate Judge did not credit that portion of Petitioner's testimony in his Report. (Report at 7.) Instead, the Magistrate Judge relied on O'Donnell's account of events and assumed that O'Donnell had told Petitioner about the plea offer. *Id.* Moreover, in his Objections to the Magistrate Judge's Report Petitioner did not object to the Magistrate Judge's findings and conclusions based on the premise that O'Donnell had informed Peti-

tioner about the plea offer. (Response to Gov't Objections at 2)("The evidence clearly shows that Mr. O'Donnell only discussed the proposed plea agreement with Petitioner in the hallway or lobby of the Federal Courthouse and that said discussion was very brief.")

During the January 14, 2004 Evidentiary Hearing before the Court, Petitioner again testified that O'Donnell never told him about the plea offer. (1/14/04 Tr. at 52.) He also recounted the conversation between himself and prosecutors Angueira and Mulvihill that occurred during the break immediately following the jury verdict in this case *Id.* at 50–52. Petitioner, Petitioner's brother, and Angueira all testified that sometime after the jury verdict was read, Petitioner approached prosecutors Angueira and Mulvihill and asked them if there was something they could do for him. *Id.* at 36–37, 50–52, 59. When one of the prosecutors responded that Petitioner should have taken the plea offer, Petitioner replied "what offer?" *Id.* Petitioner suggests that his reaction to the prosecutor's question supports his contention that he had not previously heard about the misdemeanor plea offer. (Petitioner's Post–Hearing Memo. at 9–10.) However, the Court disagrees. Petitioner's question is ambiguous at best. Having just learned of the jury's verdict, Petitioner simply may have been confused. He may not have immediately recalled an offer that had been made and rejected months earlier [5] and his question might simply have been a request for clarification. No one, including Petitioner, recalls any further discussion of the plea offer on that occasion. Moreover, there is no evidence that Petitioner ever tried to contact the prosecutors about the plea offer after that day.

Having reviewed all of the evidence in this case in light of the strong presumption that O'Donnell's conduct fell within the wide range of reasonable professional assistance, *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, the Court finds that Petitioner's testimony that O'Donnell never informed him about the misdemeanor plea offer is not credible. According to former Assistant United States Attorney Angueira, O'Donnell told Angueira that he would discuss the plea offer with his client and later stated that his client had instructed him to refuse the offer. (1/14/04 Tr. at 30–31.) If Petitioner's testimony is true, then O'Donnell not only withheld information about the plea offer from his client, he also deceived the Government. Petitioner suggests that O'Donnell "cavalierly" rejected the plea offer without consulting Petitioner either because he did not have an opportunity to discuss the plea with Petitioner or because he wanted to push the matter to trial based on his belief that Petitioner would be acquitted at trial. *Id.* at 22. Neither explanation is convincing. There is no reason to believe that O'Donnell did not have an opportunity to discuss the plea offer with his client. According to Angueira, Petitioner was present in the lobby outside the courtroom when O'Donnell communicated Petitioner's rejection of the plea to Angueira and Mulvihill. *Id.* at 31. O'Donnell certainly could have discussed the plea offer with Petitioner at that time, if he had not found an earlier opportunity to do so. Petitioner's second explanation is just as incredible. Even if O'Donnell believed that Petitioner would be acquitted, there is no evidence to suggest that O'Donnell preferred taking the matter to trial rather than resolving it through a favorable plea bargain.[6] In fact, O'Donnell testified that although he be-

---

**5.** The trial in this case lasted 10 weeks.

**6.** O'Donnell testified that his fee for representing Petitioner in this matter was $80,000.

lieved that Petitioner would be acquitted at the time the plea offer was made, his confidence in Petitioner's success at trial was not overwhelming "because [he] know[s] that anything can happen in a court of law." *Id.* at 22. Finally, the Court finds that Petitioner's testimony that he remained ignorant of the misdemeanor plea offer prior to and throughout trial is not credible in light of McMaster's testimony that Petitioner's plea offer and his decision to reject it "was a major focus of conversation [out in the hallway and the courtroom] for a period of time." *Id.* at 43–45.[7] It is hard to believe that during the course of a 10–week trial, Petitioner managed to avoid learning about a plea offer that was the subject of hallway chatter among his co-defendants and their attorneys.

The Court further finds that O'Donnell's testimony that he communicated the misdemeanor plea offer to his client is credible. O'Donnell's memory of his discussion with Petitioner regarding the plea offer is specific. Although this discussion occurred more than six years ago, O'Donnell recalls not only what was said, but approximately when and where the conversation took place, whether it was in person or on the telephone and who else was present.[8] Moreover, at the time the plea offer was made, Petitioner knew that the case against him was weak and believed that Macia would testify and exonerate him. *Id.* at 8–9, 22. Finally, throughout the trial and sentencing in this case, Petitioner maintained that he was innocent of the charges against him. Thus, it is credible that when presented with the terms of the plea offer, Petitioner rejected the plea in the manner described by O'Donnell. Based on the foregoing credibility determinations, the Court finds that Petitioner was told about the misdemeanor plea offer prior to trial.

(1/14/04 Tr. at 5.) Petitioner has not presented any evidence to suggest that O'Donnell's fee amount was affected by Petitioner's decision to go to trial, rather than accept a plea agreement.

7. McMaster testified that after court appearances, the attorneys in the case would get together "to discuss what was going to happen or what just happened and go from there." He stated that he became aware of the plea offer during one of those meetings. (1/14/04 Tr. at 43–45.) In addition, Howard Srebnick, who represented another one of Petitioner's co-defendants, testified that he learned about the plea offer extended to Petitioner "at some point," but was unsure when he became privy to the information and from what source. (1/16/04 Tr. at 7.)

8. During direct examination, O'Donnell testified as follows:

Q. What were the terms of the plea offer that Mr. Angueirra [sic] had communicated to you?

A. Entrance of a plea to a misdemeanor with no time being served by Mr. Goudie in the trial of Mr. Macia and the co-defendant.

Q. How soon after receiving this plea offer did you communicate those terms to your client?

A. Soon. It might have been the same day.

Q. In person or on the telephone?

A. In person.

Q. Do you recall where you communicated it?

A. I have a recollection of it being either in this building or in the James Lawrence King Building.

Q. Was anyone else present?

A. No....

Q. What advice did you give your client, Mr. Goudie, regarding the plea offer?

A. I told him I met with Mr. Angueirra [sic] and he had told me guess what, there is a misdemeanor in Title 18 and we are willing to offer it to John and he won't serve any time and it will not require him testifying [sic] in this trial. I said I will certainly communicate it to him.

Q. What did Goudie say in response to your communicating the offer to him?

A. He said Ed, why should I plead guilty to anything, I didn't do anything...

(1/14/04 Tr. at 13–14.)

■ The Court now turns to the question of whether or not O'Donnell's performance in communicating the plea offer to Petitioner violated Petitioner's Sixth Amendment right to counsel. The case law does not clearly define how much and what kind of information must be conveyed to a defendant in order to satisfy the performance prong of the *Strickland* standard. In *United States v. Day*, 969 F.2d 39, 43 (3d Cir.1992), the Third Circuit found that a criminal defendant who rejected a plea offer based upon his attorney's grossly inaccurate assessment of his potential sentence exposure had received ineffective assistance of counsel. Several Circuits, including the Eleventh, have since held that a defense attorney's unreasonably inaccurate advice to his or her client related to accepting or rejecting a proposed plea agreement can rise to the level of ineffective assistance. *See e.g., United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998)("By grossly underestimating Gordon's sentencing exposure in a letter to his client, Dedes breached his duty as a defense lawyer in a criminal case..."); *Meyers v. Gillis*, 142 F.3d 664, 667 (3d Cir.1998)(finding that counsel was ineffective where he provided his client with erroneous information about parole eligibility); *Finch v. Vaughn*, 67 F.3d 909, 916 (11th Cir.1995)(holding that attorney was ineffective where he mistakenly informed his client that his state and the remainder of his federal term of imprisonment would be served concurrently); *cf. Jones v. United States*, 178 F.3d 790, 794 (6th Cir.1999)(concluding that an attorney, who had not been informed of his client's criminal history, was not ineffective where he failed to explain that any prior offenses might be used to enhance his client's sentence).

■ In the instant case, Petitioner did not receive unreasonably inaccurate advice or misinformation about the terms of the plea offer. Instead, the Magistrate Judge concluded that Petitioner had received ineffective assistance of counsel based on his finding that O'Donnell had failed to adequately advise petitioner about the terms of the plea offer and the potential consequences of going to trial. (Report at 6.) Specifically, the Magistrate Judge cited O'Donnell's failure to discuss the advantages and disadvantages of the offer with Petitioner, to review the Sentencing Guidelines with Petitioner, or to explain to Petitioner the advisability of accepting or rejecting the offer. *Id.* at 9–10. In reaching this conclusion, the Magistrate Judge relied primarily on the Second Circuit's holding in *Boria v. Keane*, 99 F.3d 492, 496–98 (2d Cir.1996); that defense counsel's failure to discuss the advisability of accepting or rejecting a plea offer with his client constituted ineffective assistance of counsel. However, in *Purdy v. United States*, 208 F.3d 41, 46 (2d Cir.2000), the Second Circuit limited its holding in *Boria* to the facts of that case. To reach its conclusion, the Second Circuit relied on the fact-specific nature of the *Strickland* inquiry. *Id.* at 48.

> The *Strickland* Court...repeatedly emphasized that the "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," that a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case," and that "[t]here are countless ways to provide effective assistance in any given case."

*Id.* (quoting *Strickland*, 466 U.S. at 688–90, 104 S.Ct. 2052 (citations omitted)). The *Purdy* Court observed that "[t]he *Boria* court's task was to determine the parameters of 'a criminal defense lawyer's duty when a defendant's best interests clearly require that a proffered plea bargain be accepted, but the defendant, professing innocence, refuses to consider the matter.'" *Id.* at 46. Distinguishing the

facts of *Purdy* from those of *Boria*, the Second Circuit held that an attorney's failure to explicitly tell a client whether or not he should accept a plea offer does not constitute ineffective assistance of counsel, where the attorney "informed [his client] at length and on several occasions of the strength of the government's case," where the defendant was "a sophisticated businessman, [who] understood that the case against him was formidable," where the defendant's best interests did not necessarily demand a guilty plea, and where the defendant's "decision not to plead guilty was based on a rational calculation." *Id.* at 46–47.

In the instant case, O'Donnell testified that his discussion with Petitioner regarding the misdemeanor plea offer was brief. *Id.* at 13, 18. He explained that he repeated the plea offer, as it had been described to him: "Believe it or not there is a misdemeanor in Title 18. They are willing to let you plead guilty to a misdemeanor. You will not serve any time John nor will you be required to testify. No time, no testimony." *Id.* at 19. O'Donnell recounted that Petitioner immediately stated: "Ed, why should I plead guilty to anything, I didn't do anything." *Id.* O'Donnell recalls telling Petitioner that he admired his resolve. *Id.* O'Donnell testified that in the course of his representation of Petitioner, he had informed Petitioner that a conviction would probably result in a prison sentence. *Id.* at 15, 21. O'Donnell admitted that he never discussed with Petitioner, before or after the plea offer, the specific amount of prison time Petitioner was facing under the Sentencing Guidelines. *Id.* at 20–21. However, Petitioner testified that prior to trial he knew that if

he were convicted it would be a "very serious matter," and that he would be going to prison for a long time. *Id.* at 53.

It is clear from O'Donnell's testimony that he informed Petitioner of the plea offer and explained its terms. He did not mislead or misinform Petitioner. However, it is equally clear that the conversation was brief and that O'Donnell neither explained how the Federal Sentencing Guidelines would apply to Petitioner if he were convicted at trial, nor advised Petitioner on how he should respond to the plea offer.[9] The question before the Court is whether these omissions constitute ineffective assistance of counsel in violation of the Sixth Amendment.

In *Boria*, the Court held that a defense counsel's failure to discuss the advisability of accepting or rejecting a plea offer with his client constituted ineffective assistance of counsel. 99 F.3d at 497. However, in that case, the Court was confronted with a situation where "a defendant's best interests clearly require[d] that a proffered plea bargain be accepted, but the defendant, professing innocence, refuse[d] to consider the matter." *Id.* at 496. As the Second Circuit observed in *Purdy*, the *Boria* Court did not fashion a *per se* rule that a defense counsel must advise a client whether or not to plead guilty. 208 F.3d at 46.

The facts of the instant case are distinguishable from those of *Boria*. Like Boria, Petitioner has consistently maintained that he is innocent of the charges against him. (1/14/04 Tr. at 7, 14–15.) In rejecting the plea offer, Petitioner specifically stated that he "didn't do anything." (*Id.* at 19.) Moreover, the misdemeanor plea

---

9. The Court can only speculate how O'Donnell would have advised his client, had he offered advice. O'Donnell testified that he believed at the time that they would win the case. (1/14/04 Tr. at 22.) However, he also

testified that he did not have an overwhelming belief that they would win "because [he] know[s] anything can happen in a court of law.". *Id.*

offer was certainly favorable and its advantages should have been self-evident, even to a lay person like Petitioner. However, at the time O'Donnell presented the misdemeanor plea offer to Petitioner, O'Donnell was optimistic about Petitioner's chances at trial. (*Id.* at 22.) O'Donnell testified that he believed that the Government had little or no evidence against Petitioner. *Id.* He also stated that he expected co-defendant Macia to testify at trial and exonerate Petitioner. *Id.* at 8–9. Thus, the Court does not find that Petitioner's best interests clearly required that he accept the proffered plea agreement. Furthermore, O'Donnell testified that he had told Petitioner that his primary defense would be that the Government had very little evidence implicating Petitioner. *Id.* at 7–8. Thus, there is every reason to believe that rather than "refus[ing] to consider the matter," as Boria had, Petitioner considered the plea offer and rejected it based on a calculation that he would be acquitted at trial.

In *Purdy*, the petitioner claimed ineffective assistance based, in part, on his attorney's alleged failure to explicitly advise him to accept a guilty plea. 208 F.3d at 42. In that case, the Court focused on "whether counsel's assistance was reasonable considering all the circumstances." 208 F.3d at 46–48 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). In doing so, the Court examined factors such as: (1) the sophistication of the defendant and the information he had about the case against him, (2) the strength of the prosecution's case, and (3) whether the decision to plea or not was based on a rational calculation. *Id.* at 47. Considering the facts of that case, the *Purdy* Court held that the attorney "acted reasonably when he informed Purdy fully of the strength of the government's case against him, together with the nature of the government's plea offer, without specifically advising Purdy to take the plea." *Id.* at 48. In *Turner v. Calder-*

*on,* 281 F.3d 851, 880–81 (9th Cir.2002), the Ninth Circuit took a similar approach to a case in which a petitioner admitted that he had been informed about a plea offer, but claimed that his attorney had failed to counsel him on the consequences of going to trial and had failed to discuss in detail the significance of the plea agreement offered. In that case, the Ninth Circuit stated that "[a] defendant has the right to make a reasonably informed decision whether to accept a plea offer," but found that the petitioner in that case had the information he needed to make his decision. *Id.* at 881; *see also Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir. 1984) ("[C]ounsel need only provide his client [who is considering a plea offer] with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial.")

The Court finds that Petitioner's decision to reject the Government's plea offer was an informed decision. O'Donnell repeated the terms of the misdemeanor plea offer to Petitioner exactly as they had been explained to him by Angueira. (1/14/04 Tr. at 19.) Petitioner knew that if he accepted the plea, he would not serve prison time and would not be required to testify against co-defendants. *Id.* Moreover, Petitioner admits that he knew that a conviction in this case would be "a very serious matter" and that he would be going to prison for a long time. *Id.* at 56. It is undisputed that Petitioner and O'Donnell discussed trial strategy and the Government's case against Petitioner prior to trial. (1/14/04 Tr. 7–8.) O'Donnell testified that he had told Petitioner that the Government's case against him was weak and that O'Donnell's defense of Petitioner would focus on the Government's lack of evidence. *Id.* at 7–8. There is no reason to doubt O'Donnell's

evaluation of the strength of the case particularly when the Government acknowledges in its Objections to the Magistrate's Report and Recommendation that "the testimonial and documentary evidence introduced against [Petitioner] was far from voluminous." (Government's Objections at 9.) Furthermore, Petitioner was present in the courtroom when co-defendant Humberto Hernandez pled guilty to Count I of the Indictment and the Court informed Hernandez that the maximum possible penalty of confinement for the offense was five years imprisonment. (*Id.* at 55–56; *see also* Hernandez Change of Plea, 8/27/98 Tr. at 2, 11.) [10]

Petitioner in the instant case is a sophisticated businessman. (*See* 7/21/03 Tr. at 36–38) (Petitioner testified that he finished three years of college at the University of Houston and the University of Miami, that he studied for and passed an examination to become a state-certified real estate broker and that he has completed 30 hours of continuing education in his field every year since, including training in real estate legal principles). At the time he rejected the plea offer, he had information about the Government's case against him and understood his attorney's reasonable assessment of the strength of that case. Moreover, Petitioner has consistently and continually maintained that he is innocent of the charges against him. (1/14/04 Tr. at 7, 14.) In light of these facts, the Court finds that Petitioner's decision to reject the misdemeanor plea offer was based on his rational calculation that he was innocent and would be acquitted at trial. The Court further finds that O'Donnell's conduct was reasonable under the circumstances. He believed that Petitioner had an adequate

understanding of the case against him, the terms of the plea offer, and the possible consequences of his decision to reject that offer. Thus, O'Donnell's failure to advise Petitioner regarding whether or not he should accept the Government's plea offer did not constitute ineffective assistance of counsel.

The Magistrate Judge also based his recommendation on O'Donnell's failure to explain to Petitioner the minimum and maximum sentences he was facing under the Federal Sentencing Guidelines. (Report at 8.) The Magistrate Judge relied on three cases which discuss in dicta an attorney's duty to provide a criminal defendant with information regarding possible sentencing exposure when advising that defendant about a plea offer. *Day,* 969 F.2d at 43; *Gordon* 156 F.3d at 380 (quoting *Day*); *Slevin v. United States,* 71 F.Supp.2d 348, 354–55 (S.D.N.Y.1999) *aff'd* 234 F.3d 1263, 2000 WL 1528655 (2d Cir. 2000) (unpublished opinion). In all three cases, the courts found or declined to find a constitutional violation based on whether or not the attorney in question had provided the petitioner with "grossly inaccurate" or seriously misleading advice about sentencing exposure at trial. *Day,* 969 F.2d at 42–44 (finding ineffective assistance where counsel advised defendant before trial that defendant faced a maximum sentence of 11 years, defendant turned down a plea offer of five years and ended up receiving a twenty-two year sentence upon conviction); *Gordon,* 156 F.3d at 377, 380 (finding ineffective assistance where the maximum sentence defendant faced after trial was 12 to 17 years greater than the estimate he received from his attorney prior to trial); *Slevin,* 71 F.Supp.2d at 351,

---

**10.** Petitioner admits and the Court transcript reflects that Petitioner attended Humberto Hernandez' Change of Plea hearing held on August 27, 1998. (1/14/04 Tr. at 55–56; Hernandez Change of Plea, 8/27/98 Tr. at 2.)

During the hearing, the Court listed the defendants who were named in Count I of the Indictment. That list included Petitioner. (8/27/98 Tr. at 6.)

355 (declining to find ineffective assistance but stating that defendant's allegations, if true, would amount to ineffective assistance where defendant turned down plea offer of two years, received a six and a half year sentence after trial, and claimed that his counsel had advised him before trial that he was facing a maximum three year sentence). In the instant case, Petitioner does not allege that he was misinformed about the terms of the plea agreement or about his sentencing exposure should he reject the plea and proceed to trial. Thus, the facts, here, are distinguishable from the facts of *Day, Gordon* and *Slevin.* Furthermore, these cases rely on the same underlying principle expressed by the *Purdy* and *Turner* Courts—a criminal defendant is entitled to his attorney's assistance in making a "reasonably informed decision whether to accept a plea offer." *Day,* 969 F.2d at 43. For all of the reasons previously discussed, the Court finds that Petitioner's decision to reject the misdemeanor plea offer was an informed decision.

■ In *Day,* the Third Circuit observed that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." 969 F.2d at 43. The Court agrees that in advising a client whether to accept a plea offer, a criminal defense attorney should evaluate and consider that client's sentencing exposure under the Federal Sentencing Guidelines. Certainly, it would have been preferable if O'Donnell had discussed the Guidelines and Petitioner's possible sentencing exposure under those Guidelines with Petitioner when presenting the plea offer to him. However, the issue before the Court is whether O'Donnell's representation of Petitioner fell below an "objective standard of reasonableness" based on "prevailing professional norms." *Strickland,* 466 U.S. 668, 104 S.Ct. 2052. The Court finds that it did not.

In *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir.1984), the Eleventh Circuit made the following observation:

The right to competent plea bargain advice is at best a privilege that confers no certain benefit, unlike the fifth amendment's bar to admission of involuntary confessions. An accused may make a wise decision even without counsel's assistance, or a bad one despite superior advice from his lawyer. The Supreme Court has commented that the unpleasant choice is one the defendant ultimately must make for himself, and that the decision is often inescapably grounded on uncertainties and a weighing of intangibles.

748 F.2d at 1508. In the instant case, Petitioner made a decision based on his belief in his own innocence, his understanding of the case against him, and his attorney's assessment of the strength of that case. He understood the terms of the misdemeanor plea offer and the consequences of a guilty verdict and he took a calculated risk. He now regrets that decision and blames his misstep on inadequate advice from his attorney. However, the Court finds that O'Donnell's representation of Petitioner in connection with the Government's plea offer was reasonable in light of the paucity of evidence against Petitioner, the possibility that Macia's testimony would exonerate Petitioner at trial, and Petitioner's protestations of innocence. O'Donnell did not misinform Petitioner about the plea or the consequences of refusal, nor did he remain silent while believing his client's decision to be "suicidal." (*See Boria,* 99 F.3d at 495). He merely accepted his client's rational decision to refuse a favorable plea offer. Based on the foregoing facts and analysis, the Court finds that O'Donnell's representation of Petitioner with respect to the Government's misdemeanor plea offer was reasonable in light of prevailing professional

norms and does not constitute ineffective assistance of counsel under *Strickland.*

## ii. Prejudice Prong

■ Even assuming that Petitioner had satisfied the performance prong of the *Strickland* analysis, the Court finds that he has failed to demonstrate that he was prejudiced by O'Donnell's alleged errors. In order to demonstrate prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The *Strickland* Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner cannot show prejudice simply by asserting in hindsight that he would have accepted a plea agreement had it been properly presented to him. *Diaz,* 930 F.2d at 835; *Johnson v. Duckworth,* 793 F.2d 898, 902 n. 3 (7th Cir.1986) (noting that petitioner's statements alone do not establish a reasonable probability that he would have accepted the plea). Petitioner must offer the Court objective evidence in order to satisfy the prejudice prong of the *Strickland* analysis. *Paters v. United States,* 159 F.3d 1043, 1047 (7th Cir.1998); *Gordon,* 156 F.3d at 381. In *Cullen v. United States,* 194 F.3d 401 (2d Cir.1999), the Second Circuit described the factors a court might consider in evaluating a similar claim of prejudice as follows:

> In determining whether Cullen has shown a reasonable probability that he would have accepted the plea bargain if he had been informed of its terms, the factfinder will primarily have to make a determination of Cullen's credibility. Though a claim that he would have accepted the plea would be self-serving (like most testimony by witnesses who are parties), it ought not to be rejected solely on this account. In assessing Cul-

len's credibility, the fact-finder would be entitled, but not required, to consider Cullen's continued protestation of innocence as weighing against the credibility of his claim, and to regard the disparity between the guideline range he faced and the range as represented by defense counsel as another factor bearing upon his credibility. The credibility determination should be based on all relevant circumstances.

*Cullen,* 194 F.3d at 407–408 (citing *Gordon,* 156 F.3d at 381) (reversing the district court's finding that petitioner had failed to demonstrate prejudice and remanding the case for a hearing on that issue).

In the instant case, Petitioner testified that he would have accepted the misdemeanor plea offer, had he known about it. (1/14/04 Tr. at 54.) As the Court has already found that O'Donnell told Petitioner about the plea offer prior to trial and that Petitioner rejected the offer in the manner described by O'Donnell, the question before the Court is whether or not Petitioner would have accepted the plea offer if O'Donnell had more thoroughly explained Petitioner's sentencing exposure upon conviction and/or if O'Donnell had advised Petitioner to accept the plea offer.

In his Report, the Magistrate Judge found that Petitioner had established a reasonable probability that he would have accepted the offer if properly conveyed, based on Petitioner's own statements that he would have taken the offer, along with O'Donnell's testimony that the plea offer was "generous" and that he thought Petitioner would be "delighted" with the offer. (Report at 12)(citing 7/21/03 Tr. at 13–14, 31, 35). The Court disagrees.

The Court does not find Petitioner's statements that he would have accepted the plea offer credible. Petitioner's testimony is self-serving and his continued

protestations of innocence weigh heavily against his credibility on this issue. Moreover, the Court has already found that Petitioner's testimony that he was not informed of the plea offer is not credible and that finding casts doubt on the remainder of Petitioner's testimony. Furthermore, the instant case is unlike *Cullen* and *Gordon* in that it does not involve allegations that Petitioner received incorrect or misleading information from his attorney concerning his sentencing exposure under the Guidelines. *See Gordon,* 156 F.3d at 380 (finding ineffective assistance where the maximum sentence defendant faced after trial was 12 to 17 years greater than the estimate he received from his attorney prior to trial); *Cullen,* 194 F.3d at 402 (involving allegations that defense counsel advised petitioner prior to trial that his sentencing exposure under the guidelines would be approximately 57–71 months and petitioner was actually sentenced to 136 months). In fact, there is little if any disparity between Petitioner's actual sentence and his sentencing exposure as he understood it at the time he rejected the misdemeanor plea offer. Although O'Donnell did not specifically discuss with Petitioner the minimum and maximum sentences Petitioner might receive upon conviction, Petitioner admits that he knew that he would go to prison for a long time if he were convicted.[11] *Id.* at 56. Moreover, Petitioner was present when co-defendant Hernandez was informed by the Court that the maximum possible penalty for the offense described in Count I of the Indictment[12] was five years imprisonment. (8/27/98 Tr. at 11.)

The Court finds that Petitioner has not offered any objective evidence that he would have accepted the misdemeanor plea offer if O'Donnell had more thoroughly explained Petitioner's sentencing exposure upon conviction or if O'Donnell had advised Petitioner to accept the plea offer. In light of Petitioner's continued protestations of innocence and absent objective evidence, the Court finds that Petitioner has failed to demonstrate a reasonable probability that he would have accepted the offer if it had been properly presented by O'Donnell, and cannot satisfy the prejudice prong of the *Strickland* analysis.

Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. The Court **DECLINES TO ADOPT** the Report and Recommendation (D.E.11), issued on August 7, 2003, by Magistrate Judge Ted E. Bandstra.

2. The Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, filed April 29, 2003, by Petitioner John N. Goudie, is **DENIED.**

2. This case is **CLOSED.**

3. All pending motions not otherwise ruled upon by separate order are **DENIED AS MOOT.**

---

**11.** As the Court has previously stated, Petitioner was aware of the weaknesses of the Government's case against him, he believed that Macia would testify and exonerate him, and he steadfastly professed his innocence of the charges against him. (1/14/04 Tr. at 7–9, 22.)

**12.** Petitioner was also named in Count I of the Indictment. (8/27/98 Tr. at 6.)